Monica S. Call (#11361)
monica.call@stoel.com
STOEL RIVES LLP
201 South Main Street, Suite 1100
Salt Lake City, UT  84111-4904
Telephone: (801) 328-3131
Facsimile:  (801) 578-6999

Daren S. Garcia (*pro hac vice application forthcoming*)
dsgarcia@vorys.com
Rodney A. Holaday (*pro hac vice application forthcoming*)
raholaday@vorys.com
VORYS, SATER, SEYMOUR AND PEASE LLP
52 East Gay Street
Columbus, OH  43215
Telephone: (614) 464-8356
Facsimile:  (614) 719-5112

Attorneys for Skullcandy, Inc.

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| SKULLCANDY, INC., a Delaware corporation, | Case No: |
| Plaintiff, | |
| v. | **COMPLAINT** |
| | **JURY DEMANDED** |
| APPROVED SALES NY INC, a New York corporation, DEAL BUSTER INC., a New York corporation, SARA HANDLER, an individual, and ARNOLD HANDLER, an individual, all doing business as "Approved Sales NY" on www.amazon.com, and JOHN DOES 1-100, | |
| Defendants. | |

Plaintiff Skullcandy, Inc. ("Skullcandy") brings this action against Defendant Approved Sales NY Inc ("Approved Sales NY Inc"), Defendant Deal Buster Inc. ("Deal Buster Inc."), Defendant Sara Handler ("Sara Handler"), Defendant Arnold Handler ("Arnold Handler"), and John Does 1-100 ("Doe Defendants") (collectively, "Defendants") for trademark infringement in violation of the Lanham Act, 15 U.S.C. § 1114; unfair competition in violation of the Lanham Act, 15 U.S.C. § 1125(a); trademark dilution in violation of the Lanham Act, 15 U.S.C. § 1125(c); common law trademark infringement; deceptive trade practices in violation of Utah Code Ann. § 13-11a-3, and unfair competition in violation of Utah Code Ann. § 13-5a-102.  These claims arise out of Defendants' misappropriation of Skullcandy's trademarks in connection with Defendants' unlawful and unauthorized sale of Skullcandy®-brand products on the Internet, including the sale of materially different and non-genuine products bearing Skullcandy's trademarks that are not subject to, do not abide by, and interfere with Skullcandy's quality controls.  In support of its complaint, Skullcandy alleges as follows:

## **PARTIES**

1.      Skullcandy is a corporation, organized under the laws of the State of Delaware, with its principal place of business located in Park City, Utah.

2.     Approved Sales NY Inc is a corporation, organized under the laws of the State of New York, with its principal place of business located at 5001 18th Avenue, Brooklyn, New York 11204.   Upon information and belief, Approved Sales NY Inc operates or assists in the operation of a storefront called "Approved Sales NY" on www.amazon.com ("Amazon").

3.     Deal Buster Inc. is a corporation, organized under the laws of the State of New York, with its principal place of business located at 5117 20th Avenue, Brooklyn, New York 11204.  Upon information and belief, Deal Buster Inc. operates or assists in the operation of the "Approved Sales NY" storefront on Amazon.

4.     Sara Handler is an individual who, upon information and belief, resides at the 20th Avenue Address and may be served with process there or anywhere else she may be found.  Upon information and belief, Sara Handler operates or assists in the operation of the "Approved Sales NY" storefront on Amazon.

5.     Arnold Handler is an individual who, upon information and belief, resides at the 20th Avenue Address and may be served with process there or anywhere else she may be found.  Upon information and belief, Sara Handler operates or assists in the operation of the "Approved Sales NY" storefront on Amazon.

6.     The true names, involvement, and capacities, whether individual, corporate, associated or otherwise of the Doe Defendants are unknown to Skullcandy.   Therefore, Skullcandy sues these defendants by a fictitious name. Skullcandy is informed and believes, and on that basis alleges, that each of the Doe Defendants sued herein is responsible in some manner for the events and occurrences referred to herein or otherwise interested in the outcome of the dispute.   When the true names, involvement, and capacities of these parties are ascertained, Skullcandy will seek leave to amend this Complaint accordingly.

## JURISDICTION

7.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1338, and 28 U.S.C. § 1367.  Skullcandy's federal claims are predicated on 15 U.S.C. § 1114 and 15 U.S.C. § 1125(a) and (c), and its claims arising under the laws of the State of Utah are substantially related to its federal claims such that they form part of the same case or controversy under Article III of the United States Constitution.

8.     This Court has personal jurisdiction under the Due Process Clause because Defendants have expressly aimed tortious activities toward the State of Utah and established sufficient minimum contacts with Utah by, among other things, advertising and selling infringing Skullcandy products to consumers within Utah through one or more highly interactive commercial websites with the

knowledge that Skullcandy is located in Utah and is harmed in Utah as a result of Defendants' sales of infringing Skullcandy products to Utah residents.  Defendants have known that Skullcandy is located in Utah, among other reasons, because they have received cease-and-desist letters that identify Skullcandy as a corporation located in Utah and because the Skullcandy products they are selling identify Skullcandy as a company located in Park City, Utah.  Skullcandy's claims arise out of, among other things, Defendants' sales of infringing Skullcandy products to Utah residents.

## VENUE

9.     Venue is properly founded in this judicial district pursuant to 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Skullcandy's claims occurred within this judicial district or, in the alternative, because a Defendant is subject to personal jurisdiction in this district.

## FACTUAL ALLEGATIONS

**A.    Skullcandy and Its Trademarks**

10.     Skullcandy develops, manufactures, markets, and sells headphones and speakers.  Skullcandy sells its products through its own website and also through its network of Authorized Distributors and Authorized Resellers (collectively, "Authorized Dealers").

11. Skullcandy devotes a significant amount of time, energy, and resources toward protecting the value of its brand, products, name, and reputation. By distributing products exclusively through its own website and its Authorized Dealers, Skullcandy is able to ensure the well-being and satisfaction of consumers and maintain the integrity and reputation of the Skullcandy brand. In the highly competitive audio electronics market, quality and customer service are a fundamental part of the consumer's decision to purchase a product.

12. To promote and protect the Skullcandy brand, Skullcandy has registered numerous trademarks with the United States Patent and Trademark Office with respect to its brand and products, including but are not limited to, SKULLCANDY® (U.S. Trademark Registration Nos. 3,381,050, 3,726,304, 3,788,707, 3,168,695, 4,396,791, 4,622,094, 4,724,445, 5,166,615, and 5,215,305); CRUSHER® (U.S. Trademark Registration No. 4,573,153); HESH® (U.S. Trademark Registration No. 4,573,154); METHOD® (U.S. Trademark Registration No. 4,800,154); and SMOKIN' BUDS® (U.S. Trademark Reg. No. 4,695,063) (collectively, the "Skullcandy Trademarks").

13. The registration for each of the Skullcandy Trademarks is valid, subsisting, and in full force and effect.

14.     Skullcandy filed the SKULLCANDY® trademark on January 10, 2006, and it was registered on November 7, 2006.  Skullcandy has actively used the SKULLCANDY® trademark since that time.

15.     Skullcandy actively uses, advertises, and markets all of the Skullcandy Trademarks in commerce throughout the United States.

16.     Skullcandy was founded in 2003 and has advertised, promoted, and sold products in interstate commerce under the Skullcandy name and trademark since that time.  Examples of the types of products sold under the Skullcandy name and trademark are depicted below:



17.     Consumers recognize the Skullcandy Trademarks as being associated with high quality headphones and speakers in the audio electronics market.

18.     Consumers associate the Skullcandy Trademarks with the quality and innovation of Skullcandy's products, which have been remarkably consistent and dependable since the company's founding in 2003.  For the past 15 years and

counting, Skullcandy has committed to taking all possible measures to guarantee high quality, innovative, and long-lasting products.

19.     In 2008, Fortune Magazine praised Skullcandy products as "the world's coolest ear bud."  *See* Michael Copeland, *The world's coolest ear buds*, FORTUNE MAGAZINE (Dec. 8, 2008), http://archive.fortune.com/2008/12/30/technology/copeland_skullcandy.fortune/index.htm.

20.      For all of these reasons, the Skullcandy Trademarks are widely recognized by the general public of the United States, and Skullcandy is widely recognized as the source of products bearing the Skullcandy Trademarks.

21.     Due to the superior quality and exclusive distribution of Skullcandy products, and because Skullcandy is uniquely recognized as the source of these high quality products, the Skullcandy Trademarks have substantial value.

**B.     Online Marketplaces and the Challenges They Present to Skullcandy Product Quality**

22.     E-commerce retail sales have exploded over the past decade.  From 2007 to the beginning of 2018, the percentage of total retail sales in the United States that were completed through e-commerce channels rose from 3.1 to 9.1 percent.  *See* Stefany Zaroban, *U.S. e-commerce sales grow 16.0% in 2017*, DIGITAL COMMERCE 360 (Feb. 16, 2018) https://www.digitalcommerce360.com/2017/02/17/us-e-commerce-sales-grow-

156-2016/; *E-Commerce Retail Sales as a Percent of Total Sales*, FEDERAL

RESERVE BANK OF ST. LOUIS (May 17, 2018),

https://fred.stlouisfed.org/series/ECOMPCTSA.

23.     In 2017, consumers spent $453.46 billion on e-commerce sales, a 16

percent increase from 2016.  The massive growth in e-commerce is being driven

largely by sales on online marketplaces.  For example, in 2017 United States

consumers spent $189.61 billion in e-commerce sales on Amazon, a 30.1 percent

increase from 2016.

24.     While the online marketplaces have created a great deal of

opportunity, they also challenge a manufacturer's ability to control the quality and

efficacy of its products.

25.     For example, consumers who purchase products through the online

marketplaces cannot touch, inspect, or interact with the product before purchasing

it and cannot select a different product if the one they choose is damaged or has

been tampered with; instead, consumers must trust that the product they select on

an online marketplace will arrive in the same condition and quality they expect and

typically receive from the manufacturer.

26.     Significantly, the online marketplaces, like Amazon, allow third

parties to sell products anonymously, without the third parties disclosing their true

identities to consumers.  Accordingly, any person who is able to obtain a

manufacturer's products through unauthorized diversion can sell them on online marketplaces without having to reveal his or her identity to the consuming public. This prevents the manufacturer and consumer from reaching unauthorized marketplace sellers, like Defendants, to ensure that the manufacturer's requirement are adhered to to address any quality concerns.

27.     Unauthorized sellers commonly sell diverted products that are of compromised quality or mix fake or diluted products in shipments to unwitting consumers.  *See* Scott Cohn, *Greed Report: Your quest for savings could land you in the 'gray market'*, (Sept. 8, 2016), https://www.cnbc.com/2016/09/08/greed-report-your-quest-for-savings-could-land-you-in-the-gray-market.html.     Indeed, there is an "epidemic" of counterfeit products being sold on online marketplaces that diverters are exploiting because they know that consumers trust marketplaces and assume that the products they are buying through the marketplaces are genuine.  *See* Spencer Soper, *Amazon Gets Real About Fakes* (Nov. 28, 2016, 7:00 AM),     https://www.bloomberg.com/news/articles/2016-11-28/amazon-gets-real-about-fakes.

28.   Because  diverters,  like  Defendants,  operate  anonymously  on marketplaces and undertake great measures to maintain anonymity, manufacturers have no ability to exercise their quality controls over the products sold by the diverters or to ensure that these products meet the quality standards associated with

the brand.   A manufacturer's inability to exercise control over the quality of its products presents substantial risk of harm to consumers and to the brand at issue.

29.   Online marketplaces also pose threats to a manufacturer's ability to maintain its goodwill, reputation, and brand integrity because online marketplaces' construction and user interfaces suggest that all sellers on the marketplaces are all selling the same product when—as is the case here—they are not.

30.   When purchasing products on an online marketplace, customers cannot easily distinguish between a manufacturer's authorized and unauthorized sellers.   Indeed, on some online marketplaces, all sellers are listed under one product listing, making it practically impossible for consumers to ascertain which sellers are authorized and subject to the brand's quality standards and which sellers are selling unauthorized products outside of the manufacturer's quality controls. Unlike brick-and-mortar channels where a consumer can select another product from the shelf when the initial product selected appears to be of compromised quality, online-marketplace consumers must trust that the product appearing on their doorstep meets normal quality standards.   This reality requires manufacturers to implement quality control-programs tailored to their online-marketplace channels to protect consumers and brand goodwill.

31.   When a customer purchases a product on an online marketplace and receives a damaged, defective, expired, or poor-quality product, the customer is

more likely to associate the problem with the brand or manufacturer rather than the anonymous seller.

32.    Online marketplaces give disgruntled consumers a powerful and convenient forum to air their grievances about problem products: online product reviews.  Any consumer dissatisfied with a product received can post a review on the online marketplace for all other consumers to see.  These reviews, which are often permanently fixed, frequently criticize the brand or manufacturer of a product rather than the particular online-marketplace seller that sold the product.

33.    Product reviews on online marketplaces have a significant impact on a brand's reputation.  Survey results show that 82 percent of United States adults sometimes consult online reviews for information when they consider buying a new product online and 40 percent "always" or "almost always" consult such reviews.  *See Online Shopping and E-Commerce: 2. Online reviews*, PEW RESEARCH CENTER (Dec. 19, 2016) http://www.pewinternet.org/2016/12/19/online-reviews/.

34.    Consumers place extraordinary trust in online reviews.  Indeed, consumers are more than 10 times more likely to rely on consumer-generated product reviews than product descriptions written by manufacturers.  *See Moms Place Trust in Other Consumers*, EMARKETER (Feb. 10, 2010)

https://www.emarketer.com/Article/Moms-Place-Trust-Other-Consumers/
1007509.

35.     Because of the reliance consumers place on online reviews, negative
online reviews can sound the death knell for a manufacturer's online product
listings.  According to one study, merely three negative online reviews will deter a
majority (67%) of online consumers from purchasing a particular product.  *See*
Graham Charlton, *How many bad reviews does it take to deter shoppers?* (Apr. 12,
2011),    https://econsultancy.com/blog/7403-how-many-bad-reviews-does-it-take-
to-deter-shoppers.

**C.     Skullcandy Has Been the Target of Negative Online Marketplace Reviews from Customers Who Purchased Products from Sellers, Like Defendants, That Did Not Abide by the Quality Controls that Skullcandy Requires Authorized Dealers to Follow**

36.     Brands are often victims of anonymous, unauthorized sellers on online
marketplaces who cause consumers to post negative reviews that injure brands'
goodwill and reputation.  Skullcandy has been the subject of negative online
marketplace reviews from customers who purchased products from sellers, like
Defendants, that did not abide by the quality controls that Skullcandy requires
Authorized Dealers to follow.

37.     For example, on January 1, 2018, customer—"aida lopez"—
complained that she received a fake product: "First off these are not originals. I did
a side by side the ones i bought from the actual company and noticed that they do

not have original stamping like the ones i own. The sound quality of these are horrible and are made with very cheap material, i am returning them. Do not waste your money or time on these. Spend the extra dollars and get the real original ones."

⭐☆☆☆☆ **These are not ORIGINALS they are COUNTERFEIT!**
By aida lopez on January 1, 2018
Color: Black | Verified Purchase

First off these are not originals. I did a side by side the ones i bought from the actual company and noticed that they do not have original stamping like the ones i own. The sound quality of these are horrible and are made with very cheap material, i am returning them. Spend the extra dollars and get the real original ones.

▸ Comment  |  One person found this helpful. Was this review helpful to you? [ Yes ] [ No ]  Report abuse

38. On February 7, 2018, another customer—"Heyborne"—complained that he or she received a fake product: "Update: After visiting a factory store I have confirmed the headphones in this listing are indeed fakes. The samples on display and the items on the shelves in the corporate store hold up to the originals I have owned for years. I have owned several pair of Ink'd 2. These are NOT the same. In fact, like other views, I have compared them side by side with a good pair and everything about these is garbage. The cord is no longer soft rubber, but 'plasticy' and narrower. Everything looks and feels cheaper. The control button is barely staying together and the sound is hollow."

⭐☆☆☆☆ **Counterfeit items.**
By Heyborne on February 7, 2018
Color: Black | Verified Purchase

Update: After visiting a factory store I have confirmed the headphones in this listing are indeed fakes. The samples on display and the items on the shelves in the corporate store hold up to the originals I have owned for years.

I have owned several pair of Ink'd and Ink'd 2. These are NOT the same. In fact, like other reviews, I have compared them side by side with a good pair and everything about these is garbage. The cord is no longer soft rubber, but 'plasticy' and narrower. Everything looks and feels cheaper. The control button is barely staying together and the sound is hollow.

▸ Comment  |  2 people found this helpful. Was this review helpful to you? [ Yes ] [ No ]  Report abuse

39.     On February 7, 2018, another customer—"Ist"—complained that he or she received a fake product: "OK… There is 'Made in China' and then there is a 'Chinese Knockoff.' This is the latter. These particular earbuds are SO poorly made that a toddler can make out the flaws and faults! Plastic pieces sticking out, filter falling out, buds not holding on… List goes on and on. I've also noticed that at first when purchasing these they never mentioned anything about them selling the earbuds 'used.' Now.. for some reason they are. Hmm.. Sketchy if you ask me."



40.     On March 4, 2018, another customer—"Mr & Mrs Leal"—complained that they received a broken product: "Broken on arrival. Mine arrived with no bluetooth function, won't ever be buying third party again."



41.     On April 4, 2018, another customer—"Vbalan"—complained that he or she received a used product: "Product came yesterday. There was a crack on the frame. Brown stains around the headphones. Especially obvious since it's matt

[sic] white in color. Box looks old and chipped at a side. I honestly think i was given a Used pair Crushers. My first pair of expensive headphones that i've bought and i'm genuinely disappointed. I am returning it."

⭐ **My first pair of expensive headphones that i've bought and i'm genuinely disappointed. I am returning it**
By Vbalan on April 4, 2018
Color: Gray/Tan | Verified Purchase

Product came yesterday. There was a crack on the frame. Brown stains around the headphones. Especially obvious since it's matt white in color. Box looks old and chipped at a side.

I honestly think i was given a Used pair of Crushers. My first pair of expensive headphones that i've bought and i'm genuinely disappointed. I am returning it.



42.     On May 3, 2018, another customer—"Sean Nesbitt"—complained that he received the wrong product and the one that he received only partially worked: "Not what I ordered. I paid for skull candy crushers in black and I received a blue skull candy hesh 3. Total ripoff in my opinion and to top it off I won't be able to send these back because it's to darn expensive. Very disappointed with my order. Update: Only the left side works. Frustration level went even higher now. I've totally wasted my money on this item."

Sean Nesbitt
⭐ **Very disappointed with my order**
May 3, 2018
Color: Black | Verified Purchase

Not what I ordered. I paid for skull candy crushers in black and I received a blue skull candy hesh 3. Total ripoff in my opinion and to top it off I won't be able to send these back because it's to darn expensive. Very disappointed with my order.
Update: Only the left side works. Frustration level went even higher now. I've totally wasted money on this item.



43.     On August 31, 2018, another customer—"Pa Lor"—complained that he received a defective product: "Just unboxed it and tried to power it on like it says on the box but it didn't power on. No light or anything when I tried to charge it. I let it sit on the charger for 20 minutes but there was still no light or power indicating that it was working."

⭐☆☆☆☆ **Came in Defective**
By Pa Lor on August 31, 2018
Color: Black | **Verified Purchase**
Just unboxed it and tried to power it on like it says on the box but it didn't power on. No light or anything when I tried to charge it. I let it sit on the charger for 20 minutes but there was still no light or power indicating that it was working.

44.     Upon information and belief, the foregoing complaints were made by consumers who purchased products from unauthorized sellers of Skullcandy products.

**D.     Skullcandy Has Implemented Strict Quality Controls to Combat the Problems Presented by the Online Marketplaces and to Protect the Value of the Skullcandy Trademarks**

45.     Recognizing the risks to its consumers and the reputational damage caused by the illegal sale of non-genuine Skullcandy products by unauthorized sellers like Defendants, Skullcandy implemented a quality control program that applies to both brick and mortar retail settings and online sellers.  The program is intended to protect consumers and protect the value and goodwill associated with the Skullcandy brand.

46.     Skullcandy's quality control program seeks to ensure that consumers who buy Skullcandy products online receive products that feature all of the special

characteristics that consumers have come to expect from products sold under the Skullcandy name.

47.     The program seeks to minimize the likelihood in today's increasingly e-commerce driven market that poor quality products will reach consumers.

48.     Skullcandy abides by its quality control requirements and requires its Authorized Dealers to abide by them as well.

49.     Skullcandy's ability to exercise its quality controls is essential to the integrity and quality of Skullcandy products, as well as the value of the Skullcandy Trademarks and other intellectual property.

**E.     Authorized Dealers May Sell Skullcandy Products Only through Specific Channels and Must Adhere to Skullcandy's Quality Controls and Customer Service Requirements**

50.     Skullcandy maintains strict quality controls over its products by selling Skullcandy products exclusively to customers directly or to Authorized Dealers.

51.     Skullcandy permits Authorized Dealers to sell Skullcandy products only in specific channels and requires Authorized Dealers to abide by applicable Skullcandy policies and rules relating to quality controls, customer service, and other sales practices (collectively, the "Skullcandy Rules").

52.     Authorized Distributors are permitted to sell Skullcandy products only to Authorized Retailers.  Skullcandy's policies define an "Authorized Retailer" as

an individual or business that: (1) Skullcandy has approved as a seller of Skullcandy products; (2) purchases and resells products as part of a commercial enterprise and is not an End User of Skullcandy products; (3) has agreed to follow the Skullcandy Rules, and (4) has not had its Authorized Retailer status revoked by Skullcandy.

53.   Authorized Retailers are permitted to sell Skullcandy products only to End Users.   The Skullcandy Rules define an "End User" as a purchaser of Skullcandy products who is the ultimate consumer of the products and who does not intend to resell the products to a third party.   Authorized Retailers are strictly prohibited from selling Skullcandy products to any person or entity the Authorized Retailer knows or has reason to know intends to resell the products.

54.   Authorized Retailers are permitted to sell Skullcandy products to End Users on the Internet only if the products are sold on Permissible Websites. Among other requirements, the Skullcandy Rules require that "Permissible Websites": (1) be operated by an Authorized Retailer in the Authorized Retailer's legal name or registered fictitious name; (2) conspicuously state the Authorized Retailer's legal name, mailing address, telephone number, and email address (i.e., Authorized Retailers cannot sell products anonymously); (3) not use any third-party fulfillment service to store products or fulfill product orders, such that customers could receive products that did not come from the Authorized Retailer's

inventory; (4) use only images of Skullcandy products that were supplied by or authorized by Skullcandy and keep all product descriptions accurate and up to date; and (5) comply with various privacy, accessibility, and data security laws, regulations, and industry standards.

55.    All Authorized Dealers (Authorized Distributors and Authorized Retailers) are prohibited from selling Skullcandy products on any third-party online marketplace—such as Amazon, www.ebay.com, www.walmart.com, and www.jet.com—without Skullcandy's prior written consent.

56.    These restrictions are to ensure that Skullcandy knows who its Authorized Dealers are, which ones are selling online and where they are selling online, and how to immediately contact them in the event of any product quality issues.

57.    The Skullcandy Rules also require Authorized Dealers to adhere to Skullcandy's quality control requirements.

58.    To ensure that customers receive the genuine and high-quality products they expect from Skullcandy products, the Skullcandy Rules require that Authorized Dealers inspect all products for damage, defects, and other non-conformance and remove all such products from inventory.  Further, to assist Skullcandy in identifying any product quality issues, Authorized Dealers are required to report any defects to Skullcandy.

59.     The Skullcandy Rules also require that Authorized Dealers store products in accordance with guidelines issued by Skullcandy.  Importantly, for the efficacy of Skullcandy products, Authorized Dealers must store products in a cool, dry place, away from direct sunlight, extreme heat, and dampness and in accordance with applicable laws, rules regulations, and any other storage guidelines specified by Skullcandy.

60.     To avoid consumer confusion and ensure that customers receive genuine Skullcandy products, Authorized Dealers are prohibited from relabeling, repackaging, or altering Skullcandy products.   Authorized Dealers are also prohibited from removing, translating, or modifying the contents of any label or literature on or accompanying Skullcandy products.  Further, Authorized Dealers are prohibited from tampering with, defacing, or otherwise altering any identifying information on Skullcandy products, including lot codes, batch codes, and serial numbers.

61.     Skullcandy further requires that its Authorized Dealers assist with any recalls and other consumer safety information efforts.   To detect counterfeit products, conduct recalls, and disseminate other warnings about its products, Skullcandy places serial numbers on many of its products.  Skullcandy's serial numbers allow it to keep track of which specific products have been sold to a specific Authorized Dealer and alert Authorized Dealers if specific products ever

need to be recalled or receive other attention. The serial numbers also allow Skullcandy to determine which Authorized Dealer a specific product was sold to when a customer complains of poor quality and provides the serial number for the product at issue.

62.     The Skullcandy Rules also require that certain services be provided to customers. For example, Authorized Retailers must familiarize themselves with the features of all Skullcandy products kept in their inventory. This requirement ensures that Authorized Retailers are uniquely qualified not only to recommend the Skullcandy products best suited for end-user consumers' needs and well-being, but also to advise end-user consumers on how to use Skullcandy products safely and properly.

63.     Following the sale of genuine Skullcandy products, Authorized Retailers provide ongoing support to end-user consumers and are required to provide expeditious customer service by responding promptly to consumer inquiries.

64.     If Skullcandy learns that an Authorized Dealer is selling Skullcandy products of poor quality or is otherwise not adhering to Skullcandy's quality controls, Skullcandy conducts an investigation to determine the source of the problem. The Skullcandy Rules require that Authorized Dealers cooperate with Skullcandy's investigation and disclose all information about where they obtained

Skullcandy products.  Based on what its investigation reveals, Skullcandy has the right to cease selling its products to Authorized Dealers and to terminate their status as Authorized Dealers.

65.    Skullcandy's quality control requirements are legitimate, substantial, and non-pretextual and have been implemented so that Skullcandy can control the quality of goods manufactured and sold under the Skullcandy Trademarks, which protects consumers and the value and goodwill associated with the Skullcandy Trademarks.

66.    Skullcandy's quality control requirements are also material because they are designed to protect consumers and prevent them from receiving poor quality products that could harm them or cause harm to Skullcandy's reputation and goodwill.

67.    Consumers consider it material and relevant to their purchasing decisions to know whether Skullcandy products are being sold by Authorized Dealers that are subject to Skullcandy's quality control requirements or whether they are being sold by unauthorized sellers that are not subject to and do not abide by Skullcandy's quality controls and over whom Skullcandy is unable to exercise its quality controls.

**F.     Skullcandy Provides a Warranty Only for Products Subject to its Quality Controls**

68.     Skullcandy provides a two year limited manufacturer's warranty (the "Limited Warranty") for all products sold to End Users by Authorized Retailers. The Limited Warranty provides that, if at the time of purchase a product contained a manufacturing defect or had been damaged by improper care prior to the time of purchase, Skullcandy will (i) repair, (ii) replace, or (iii) provide a Warranty Credit for the product for use on the Skullcandy online store.

69.     Skullcandy extends the Limited Warranty only to products that were sold by sellers subject to Skullcandy's quality controls.  Because products sold by unauthorized sellers are not subject to Skullcandy's quality controls and Skullcandy cannot ensure the quality of such products, the Limited Warranty is not available for Skullcandy products sold by unauthorized sellers.

70.     The Limited Warranty is a material element of genuine Skullcandy products and likewise as a material component of customer purchasing decisions.

**G.     Defendants' Illegal Sales of Skullcandy Products on the Internet**

71.     To ensure that Authorized Dealers adhere to Skullcandy's quality control requirements and restrictions on authorized online sales, Skullcandy regularly monitors sales of its products on the Internet.

72.   In the course of this monitoring, Skullcandy discovered in May 2018 that products bearing the Skullcandy Trademarks were being illegally sold on Amazon through a storefront called "Approved Sales NY."

73.   On information and belief, Defendants created the Amazon storefront "Approved Sales NY" during or before May 2018 and began selling products bearing the Skullcandy Trademarks through the storefront thereafter.

74.   Defendants are not Authorized Dealers of Skullcandy products and do not comply with the Skullcandy Rules.

75.   Despite not being approved as Authorized Dealers, Defendants have sold, and continue to sell, products bearing the Skullcandy Trademarks through their Amazon storefront.

## H.   Defendants Do Not Abide by Skullcandy's Quality Controls and Customer Service Requirements

76.   Defendants do not abide by Skullcandy's quality control measures that it imposes upon Authorized Dealers.

77.   Defendants do not comply with Skullcandy's quality control requirements because they have not provided Skullcandy their business information or given Skullcandy an opportunity to vet them to determine if they meet Skullcandy's high level of standards that it demands of its Authorized Dealers.

78.   Defendants do not comply with Skullcandy's quality control requirements because they sell products on their Amazon storefront anonymously. Defendants' storefront page does not include their business name, mailing address, or email address, or any other contact information.  In fact, as discussed in greater detail below, Defendants undertake great efforts to maintain anonymity and prevent anyone from contacting them regarding their business and poor-quality products they sell to unwitting consumers.  Defendants' concerted efforts at maintaining anonymity prevent Skullcandy from addressing any quality control issues or negative reviews that arise out of Defendants' sale of products bearing the Skullcandy Trademarks, such as the complaints discussed above.

79.   Defendants also do not comply with Skullcandy's quality control requirements because they have not disclosed to Skullcandy where they acquire products that bear the Skullcandy Trademarks.  Accordingly, Skullcandy cannot determine if any products sold by Defendants are genuine.

80.   Defendants do not comply with Skullcandy's quality control requirements with respect to inventory because, upon information and belief, Defendants do not inspect the products they sell for damage, defects, evidence of tampering, and other non-conformance and remove all such products from inventory.  Instead, upon information and belief, Defendants sell products bearing the Skullcandy Trademarks that are damaged or of otherwise lesser quality.

81.    Defendants do not comply with Skullcandy's quality control requirements with respect to storage conditions because, upon information and belief, Defendants do not store their products in a cool, dry place, away from direct sunlight, extreme heat, and dampness.

82.    Defendants do not comply with Skullcandy's quality control fulfillment requirements because, on information and belief, they store their products at Amazon warehouses, they allow their inventory stored at Amazon's warehouses to be commingled with other sellers' inventory, and/or they keep no product inventory at all and solely order Skullcandy products from other online storefronts after customers purchase products from Defendants' Amazon storefront.  As a result, even if Defendants were to implement quality-assurance procedures comparable to those that Skullcandy requires of Authorized Dealers, customers still could not be assured of receiving products that abide by those quality controls when purchasing Skullcandy products from Defendants.

83.    Defendants do not comply with Skullcandy's quality control requirements because, upon information and belief, they sell products as "new" that have been opened, returned and/or repackaged.  Upon information and belief, Defendants allow products that are returned to Amazon to be repackaged and placed back in their inventory as "new" products.  This results in consumers, who

believe they are purchasing new Skullcandy products, actually receiving returned products of inferior quality.

84.    Upon information and belief, Defendants do not comply with Skullcandy's quality control requirements related to the handling, packaging, and shipping of products because Defendants sell products bearing the Skullcandy Trademarks that arrive damaged or defective.

85.    Defendants' failure to abide by the Skullcandy Rules prevents Skullcandy from exercising control over the quality of products Defendants sell bearing the Skullcandy Trademarks.  Skullcandy cannot audit Defendants to ensure they are complying with Skullcandy's quality controls and/or close Defendants' account for failing to comply with Skullcandy's quality control requirements.

86.    Defendants' failure to comply with the Skullcandy Rules also interferes with Skullcandy's quality controls because Skullcandy cannot obtain Defendants' assistance with any recall or consumer safety information efforts that may arise with respect to products sold by Defendants.

87.    Defendants also do not comply with Skullcandy's customer service requirements because they are not qualified nor have they been trained by Skullcandy to accurately describe, demonstrate, and sell the products in their inventory and to advise customers on the safe and proper use of Skullcandy products.

88.     Defendants also do not comply with Skullcandy's customer service requirements because they do not, and are unable to, provide ongoing support and responses to consumer inquiries that Skullcandy requires of its Authorized Dealers.

89.     Defendants do not comply with Skullcandy's customer service requirements because they do not take appropriate steps to address negative reviews from customers and do not cooperate with Skullcandy in investigating negative product reviews.

**I.      Defendants are Infringing on the Skullcandy Trademarks by Selling Products Bearing the Skullcandy Trademarks That are Not Subject to, Do Not Abide by, and Interfere with Skullcandy's Quality Controls and Customer Service Requirements and by Selling Products that Do Not Come with the Skullcandy Limited Warranty**

90.     For all of the reasons set forth above, the products Defendants sell bearing the Skullcandy Trademarks fail to adhere to the extensive and legitimate quality controls that Skullcandy exercises over products bearing the Skullcandy Trademarks to protect consumers and its brand goodwill.

91.     The products sold by Defendants are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

92.     Defendants' unauthorized sale of products bearing the Skullcandy Trademarks infringes on the Skullcandy Trademarks and diminishes their value.

93.    Because the products Defendants sell are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, the products Defendants sell are materially different from genuine Skullcandy products.

94.    The products Defendants sell are also materially different from genuine Skullcandy products because they are not covered by the Skullcandy Limited Warranty.

95.    Defendants' unauthorized sale of non-genuine products bearing the Skullcandy Trademarks is likely to, and does, create customer confusion because customers who purchase products from Defendants believe they are purchasing genuine Skullcandy products when, in fact, they are not.

96.    Despite these facts, Defendants have sold, and continue to sell, products bearing the Skullcandy Trademarks through their Amazon storefront without Skullcandy's consent.

97.    Many consumers have complained about products they purchased from Defendants through their "Approved Sales NY" storefront.  For example, on November 12, 2015, a customer—"JOANNE ALEXANDER"—complained that she purchased a product that was unsealed and was missing a part: "the item came with the seals already torn on product package and it was missing the power cord. Very disappointed."

★☆☆☆☆   *"the item came with the seals already torn on product package and it was missing the power cord. Very disappointed."*
By JOANNE ALEXANDER on November 12, 2015.

98.    On August 12, 2016, a customer—"Eck"—complained that he or she received a defective and damaged product: "Product was defective upon first use. The audio jack connection was damaged, causing the audio to cut in and out."

★☆☆☆☆   *"Product was defective upon first use. The audio jack connection was damaged, causing the audio to cut in and out. I've had similar issues with cassette adapters before, but after much wear and tear."*
Read less
By Eck on August 12, 2016.

99.    On May 21, 2017, a customer—"John"—complained that he received a used product when he had purchased a new one: "Condition: 'NEW', sent used open box."

★★☆☆☆   *"Condition: "NEW", sent used open box. Received refund."*
By John on May 21, 2017.

100.   On June 12, 2017, a customer—"German Garcia"—complained that he received a defective product: "Only one side is working, you lie in the description, product is not tested and is not working ok!! this is a shame !!!"

★☆☆☆☆   *"Only one side is working, you lie in the description, product is not tested and is not working ok!! this is a shame !!!"*
By German Garcia on June 12, 2017.

101.   On July 6, 2017, a customer—"Swim Mom"—complained that she received a product that was missing a part: "I ordered this product earlier and it arrived missing the USB toggle to enable wireless connectivity. This was the replacement order and, again, it was missing the USB toggle. Both the Amazon

website and product packaging indicate that the USB toggle supposed to be included. I will not be ordering this item again. Very disappointing service."

⭐☆☆☆☆ *"I ordered this product earlier and it arrived missing the USB toggle to enable wireless connectivity. This was the replacement order and, again, it was missing the USB toggle. Both the Amazon website and product packaging indicate that the USB toggle supposed to be included. I will not be ordering this item again. Very disappointing service. "*
Read less

By Swim Mom on July 6, 2017.

102.   On October 18, 2017, a customer—DblK—complained that he or she received broken products that came in previously opened packages: "Garbage. I am actually returning 2 of these. Both that I received this week were broken and did not work. One was the mic and the other was the sound. Both packages had been previously opened and then taped again."

⭐☆☆☆☆ *"Garbage. I am actually returning 2 of these. Both that I received this week were broken and did not work. One was the mic and the other was the sound. Both packages had been previously opened and then taped again. Absolute garbage and a waste of my time. Save yourself time and frustration and buy something else. "*
Read less

By DblK on October 18, 2017.

103.   On September 20, 2018, a customer—JM—complained that he or she received a product inferior to the one he or she had attempted to purchase: "Item not as described. Seller sent a cheap braided cable when the item on the page shows a thick rubber one.  Bait and switch."

⭐☆☆☆☆ *"Item not as described. Seller sent a cheap braided cable when the item on the page shows a thick rubber one. Bait and switch "*
By JM on September 20, 2018.

104.   These complaints are typical of the complaints made about products sold by unauthorized sellers, including the sale of tampered with and poor quality products.

105.   Upon information and belief, additional consumers have made complaints about the quality of products bearing the Skullcandy Trademarks that Defendants sold through their "Approved Sales NY" storefront.

**J.   Skullcandy Has Repeatedly Attempted to Stop Defendants' Illegal Sale of Products Bearing the Skullcandy Trademarks but Defendants Continue to Willfully Infringe on the Skullcandy Trademarks**

106.   After Skullcandy discovered products bearing the Skullcandy Trademarks being illegally sold on the "Approved Sales NY" storefront, Skullcandy began an investigation to determine who was operating the storefront. There was (and continues to be) no contact information of any kind on the "Approved Sales NY" storefront, so Skullcandy had to spend significant time and sources investigating the storefront to identify its operators.

107.   Through its initial investigation, Skullcandy determined that the "Approved Sales NY" storefront is operated, at least in part, by Approved Sales NY Inc.  On or about May 10, 2018, counsel for Skullcandy sent a cease and desist letter to the address listed on the New York Secretary of State website for Approved Sales NY Inc—5001 18th Avenue, Brooklyn, New York 11204 (the "18th Avenue Address")—demanding that it immediately cease selling products

bearing the Skullcandy Trademarks.  Skullcandy did not receive a response to its letter, and the "Approved Sales NY" storefront continued to offer products bearing the Skullcandy Trademarks for sale.

108.   On or about May 22, 2018, counsel for Skullcandy sent a second letter to Approved Sales NY Inc at the same address, this time including a draft complaint.  Skullcandy again did not receive a response to its letter and the "Approved Sales NY" storefront continued to offer products bearing the Skullcandy Trademarks for sale.

109.   In October 2018, counsel for Skullcandy received information through a subpoena which showed that the operator of the "Approved Sales NY" storefront provided the 18th Street Address as its contact address, further confirming that Approved Sales NY Inc operates or assists in the operation of the "Approved Sales NY" storefront.

110.   Through additional investigation, Skullcandy discovered that public records connect Approved Sales NY Inc to a second address: 5117 20th Avenue, Brooklyn, New York 11204 (the "20th Avenue Address"). Through further investigation, Skullcandy discovered that the 20th Avenue Address is a residence owned by Sara Handler and Arnold Handler and is also the registered business address for Deal Buster Inc.  Sara Handler is listed on the New York Secretary of State website as the Chief Executive Officer of Deal Buster Inc., while Arnold

Handler is listed as the incorporator of Deal Buster Inc. on the entity's Certificate of Incorporation.

111.  After learning this information, on or about November 8, 2018, Skullcandy sent another cease and desist letter to Deal Buster Inc., Sara Handler, and Arnold Handler at the 20th Avenue Address.  This letter demanded that Defendants cease selling products bearing the Skullcandy Trademarks and also warned them of their legal duty to not destroy relevant evidence in light of imminent litigation with Skullcandy.

112.  As of the time of filing, Skullcandy has not received a response to any of its letters to Defendants and the "Approved Sales NY" storefront continues to offer for sale, and sell, non-genuine Skullcandy products.

113.  For the reasons discussed above, the products Defendants are selling are not genuine Skullcandy products, are not subject to, do not abide by, and do not come with the Skullcandy Limited Warranty, interfere with Skullcandy's quality controls and customer service requirements, and are materially different from genuine Skullcandy products.

114.  Through their sales of products bearing the Skullcandy Trademarks, Defendants have misled, and continue to mislead, consumers into believing that they are purchasing genuine Skullcandy products when, in fact, they are not.

115.   Defendants' actions infringe on the Skullcandy Trademarks and diminish their value.

116.   Further, Defendants' disregard of communications from Skullcandy and continued sale of non-genuine products despite being informed of their unlawful conduct demonstrates that they are acting intentionally, willfully, and maliciously.

## K.   Skullcandy Has Suffered Significant Harm as a Result of Defendants' Conduct

117.   As set forth above, the unauthorized sale of products bearing the Skullcandy Trademarks through unauthorized sellers, such as Defendants, has caused significant harm to the Skullcandy brand.

118.   When a consumer receives a poor quality, defective, counterfeit, or tampered-with product from Defendants, the consumer associates that negative experience with Skullcandy.  As a result, Defendants' ongoing sale of unauthorized products bearing the Skullcandy Trademarks harms the Skullcandy brand.

119.   Skullcandy has suffered and will continue to suffer significant monetary harm as a result of Defendants' actions including, but not limited to, loss of sales, damage to its intellectual property, and damage to its existing and potential business relations.

120.   Skullcandy has suffered, and will continue to suffer, irreparable harm as a result of Defendants' actions, including, but not limited to, irreparable harm to

its reputation, goodwill, business and customer relationships, intellectual property rights and brand integrity.

121. Skullcandy is entitled to injunctive relief because, unless enjoined by this Court, Defendants will continue to unlawfully sell Skullcandy products, causing continued irreparable harm to Skullcandy's reputation, goodwill, relationships, intellectual property and brand integrity.

122. Defendants' conduct was and is knowing, intentional, willful, malicious, wanton and contrary to law.

123. Defendants' willful violations of the Skullcandy Trademarks and continued pattern of misconduct demonstrate intent to harm Skullcandy.

## L.    Liability of Sara Handler and Arnold Handler

124. On information and belief, Sara Handler and Arnold Handler (collectively, "the Handlers") are in control of, principals of, and are primarily responsible for the actions of Deal Buster Inc. and Approved Sales NY Inc.

125. Skullcandy asserts claims against each of the Handlers in both their individual capacities and their capacities as corporate officers of Deal Buster Inc. and Approved Sales NY Inc.

126. Until it conducts discovery, Skullcandy cannot determine whether Deal Buster Inc., Approved Sales NY Inc, the Handlers in their individual

capacities, or any combination or all of these Defendants jointly operate the "Approved Sales NY" storefront on Amazon.

127. Alternatively, on information and belief, the Handlers direct, control, ratify, participate in, or are the moving forces behind the sales of infringing Skullcandy products by Deal Buster Inc. and Approved Sales NY Inc. Accordingly, each of the Handlers is personally liable for infringing activities of Deal Buster Inc. and Approved Sales NY Inc without regard to piercing the corporate veil.

128. Alternatively, on information and belief, Deal Buster Inc. and Approved Sales NY Inc follow so few corporate formalities and are so dominated by the Handlers that they are merely alter egos of the Handlers. This is reflected, in part, by the fact that publicly-listed addresses of Deal Buster Inc. and Approved Sales NY Inc are the same address as the Handlers' home residence. Accordingly, Skullcandy is entitled to pierce the corporate veil of Deal Buster Inc. and Approved Sales NY Inc and hold each of the Handlers personally liable for the infringing activities of Deal Buster Inc. and Approved Sales NY Inc.

## FIRST CAUSE OF ACTION
### Trademark Infringement
### 15 U.S.C. § 1114

129. Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

130.   Skullcandy is the owner of the Skullcandy Trademarks.

131.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

132.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

133.   Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in commerce for purposes of selling Skullcandy products on the Internet without the consent of Skullcandy.

134.   The products Defendants sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

135.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

136.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

137.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a protect bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

138.   The products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

139.   The products Defendants sell bearing the Skullcandy Trademarks do not come with Skullcandy's Limited Warranty.

140.   Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and additionally do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

141.   Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

142.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

143.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers

because it suggests that the products Defendants offer for sale are subject to and abide by Skullcandy's quality controls, and come with the Limited Warranty when, in fact, they do not.

144.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Skullcandy products when, in fact, they are not.

145.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Skullcandy when, in fact, they are not.

146.   Defendants' unauthorized use of the Skullcandy Trademarks has infringed upon and materially damaged the value of the Skullcandy Trademarks and caused significant damage to Skullcandy's business relationships.

147.   As a proximate result of Defendants' actions, Skullcandy has suffered, and continues to suffer immediate and irreparable harm.   Skullcandy has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

148.   Skullcandy is entitled to recover its damages caused by Defendants' infringement of the Skullcandy Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

149.   Skullcandy is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Skullcandy will suffer irreparable harm.

150.   Skullcandy is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Skullcandy Trademarks.

**SECOND CAUSE OF ACTION**
**Unfair Competition**
**15 U.S.C. § 1125(a)**

151.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

152.   Skullcandy is the owner of the Skullcandy Trademarks.

153.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

154.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

155.   Defendants have willfully and knowingly used, and continue to use, the Skullcandy Trademarks in commerce for purposes of selling and advertising products bearings the Skullcandy Trademarks without the consent of Skullcandy.

156.   The products Defendants advertise and sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

157.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

158.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

159.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

160.   The products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

161.   The products Defendants advertise and sell bearing the Skullcandy Trademarks do not come with Skullcandy's Limited Warranty.

162.   Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

163.   Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

164.   Defendants' unauthorized advertisement and sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

165.   Defendants' use of the Skullcandy Trademarks in connection with their unauthorized sale and advertising of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to and abide by Skullcandy's quality control program, and come with the Limited Warranty and customer service benefits, when, in fact, they do not.

166.  Defendants' use of the Skullcandy Trademarks in connection with their unauthorized sale and advertising of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Skullcandy products when, in fact, they are not.

167.  Defendants' use of the Skullcandy Trademarks in connection with their unauthorized sale and advertising of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are sponsored by, authorized by, approved by, or otherwise connected with Skullcandy when, in fact, they are not.

168.  Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising infringes on the Skullcandy Trademarks.

169.  Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising has materially damaged the value of the Skullcandy Trademarks and has caused significant damages to Skullcandy's business relations.

170.   As a proximate result of Defendants' actions, Skullcandy has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial

171.   Skullcandy is entitled to recover its damages caused by Defendants' infringement of the Skullcandy Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

172.   Skullcandy is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Skullcandy will suffer irreparable harm.

173.   Skullcandy is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Skullcandy Trademarks.

### THIRD CAUSE OF ACTION
**Trademark Dilution**
**15 U.S.C. §1125(c)**

174.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

175.   Skullcandy is the owner of the Skullcandy Trademarks.

176.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

177.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

178.   For fifteen years, Skullcandy has marketed and sold products under the Skullcandy name throughout the United States.

179.   Skullcandy filed the SKULLCANDY® trademark on January 10, 2006, and it was registered on November 7, 2006.  Skullcandy has actively used and marketed products under the SKULLCANDY® trademark since that time.

180.   Skullcandy has expended substantial time, money, and resources advertising and promoting Skullcandy products with the SKULLCANDY® trademark.

181.   Skullcandy markets, advertises, and sells products using the SKULLCANDY® trademark throughout the United States.

182.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

183.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

184.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a protect bearing the Skullcandy

Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

185.   Skullcandy also offers the Limited Warranty for genuine Skullcandy products purchased from Authorized Dealers.

186.  Consumers recognize the SKULLCANDY® trademark as being associated with high quality headphones and speakers in the audio electronics market.

187.  The SKULLCANDY® trademark is also well known for its association with counterculture and self-expression.

188.   Because of the quality and innovation of Skullcandy products and the longevity of the use of the Skullcandy name and SKULLCANDY® trademark, consumers trust the Skullcandy name and Skullcandy products.

189.   The SKULLCANDY® Trademark is widely recognized by the general public of the United States and Skullcandy is widely recognized as the source of products bearing the Skullcandy Trademarks.

190.   The SKULLCANDY® trademark is the means by which Skullcandy products are distinguished from others in the marketplace.

191.   The SKULLCANDY® trademark is inherently distinctive, and as a result of Skullcandy's long, continuous, and exclusive use of the

SKULLCANDY® trademark, it has acquired a secondary meaning associated by purchasers and the public with Skullcandy products.

192. For these reasons, since at least 2016, the SKULLCANDY® trademark has been famous, distinctive, and widely recognized by the consuming public.

193. After the SKULLCANDY® trademark became famous in 2017, Defendants began willfully and knowingly using, and continue to use, the SKULLCANDY® trademark in commerce for purposes of selling products bearing the SKULLCANDY® trademark on the Internet without Skullcandy's consent.

194. Defendants' willful use of the SKULLCANDY® trademark in connection with the unauthorized and illegal sale of its products dilutes the SKULLCANDY® trademark because the products Defendants sell are not subject to, and do not abide by, Skullcandy's quality controls and interfere with Skullcandy's ability to exercise control over the quality of its products.

195. Consumers who receive poor quality products from Defendants associate that lack of quality with Skullcandy and the SKULLCANDY® trademark.

196. Consumers who receive poor quality products submit negative online reviews disparaging Skullcandy and the SKULLCANDY® trademark. These

negative reviews influence other consumers and cause them to become less likely to purchase Skullcandy products and trust products bearing the SKULLCANDY® trademark.

197.   As a result, Defendants' unauthorized and willful use of the SKULLCANDY® trademark has tarnished and diluted the SKULLCANDY® trademark.

198.   As a proximate result of Defendants' actions, Skullcandy has suffered, and will continue to suffer, damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

199.   Skullcandy is entitled to recover its damages caused by Defendants' infringement of the Skullcandy Trademarks and disgorge Defendants' profits from their willfully infringing sales and unjust enrichment.

200.   Skullcandy is entitled to injunctive relief under 15 U.S.C. § 1116 because it has no adequate remedy at law for Defendants' infringement and unless Defendants are permanently enjoined, Skullcandy will suffer irreparable harm.

201.   Skullcandy is entitled to enhanced damages and attorneys' fees under 15 U.S.C. § 1117(a) because Defendants willfully, intentionally, maliciously, and in bad faith infringed on the Skullcandy Trademarks.

## FOURTH CAUSE OF ACTION
**Common Law Trademark Infringement**

202.  Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

203.  This claim arises under the laws of the State of Utah.

204.  Skullcandy is the owner of the Skullcandy Trademarks.

205.  Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

206.  The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

207.  The Skullcandy Trademarks are distinctive and widely recognized by the consuming public.  Skullcandy products are sold and purchased through Skullcandy's Authorized Dealers throughout the United States, including Utah.

208.  Skullcandy is widely recognized as the designated source of goods bearing the Skullcandy Trademarks.

209.   Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in interstate commerce for the purpose of selling products bearing the Skullcandy Trademarks without Skullcandy's consent.

210.  The products Defendants sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

211.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

212.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

213.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving lesser quality products.  When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

214.   The products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

215.   The products Defendants sell bearing the Skullcandy Trademarks do not come with the Limited Warranty.

216.   Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

217.   Because the products Defendants sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

218.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

219.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are subject to and abide by Skullcandy's quality controls, and come with the Limited Warranty and customer service benefits, when, in fact, they do not.

220.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers because it suggests that the products Defendants offer for sale are genuine Skullcandy products when, in fact, they are not.

221.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks is likely to cause confusion, cause mistake, or deceive consumers

because it suggests that the products Defendants offer for sale are sponsored, authorized, or otherwise connected with Skullcandy when, in fact, they are not.

222.   Defendants' knowing and willful use of the Skullcandy Trademarks in connection with the unauthorized and illegal sale of products bearing the Skullcandy Trademarks without Skullcandy's consent infringes on the Skullcandy Trademarks and is contrary to honest practice in industrial and commercial matters.

223.   Defendants' unlawful actions and unauthorized use of the Skullcandy Trademarks has materially damaged the value of the Skullcandy Trademarks, caused significant damage to Skullcandy's business relations, and infringed on the Skullcandy Trademarks.

224.   As a proximate result of Defendants' actions, Skullcandy has suffered, and will continue to suffer, irreparable harm, as well as damage to its business, goodwill, reputation, and profits in an amount to be proven at trial.

225.   Skullcandy is entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## FIFTH CAUSE OF ACTION
### Deceptive Trade Practices
### Utah Code Ann. § 13-11a-3

226.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

227.   This claim arises under the laws of the State of Utah.

228.   Skullcandy is the owner of the Skullcandy Trademarks.

229.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

230.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

231.   Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in interstate commerce, including through their product listings on Amazon, for purposes of advertising, promoting, and selling Skullcandy products on the Internet without Skullcandy's consent.

232.   Defendants' advertisements and promotions of products unlawfully using the Skullcandy Trademarks have been disseminated to the relevant purchasing public.

233.   The products Defendants advertise and sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

234.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

235.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

236.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

237.   The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

238.   The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks do not come with the Limited Warranty, which would be relevant to the consumers' purchasing decision.

239.   Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come

with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

240.   Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

241.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

242.   Defendants' use of the Skullcandy Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of Skullcandy products because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with Skullcandy when, in fact, they are not.

243.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks, and unauthorized use of the Skullcandy Trademarks in advertising constitute deceptive trade practices under Utah Code Ann. § 13-11a-3.

244.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks, and unauthorized use of the Skullcandy Trademarks in advertising materially damages the value of the Skullcandy Trademarks and causes significant damages to Skullcandy's business relations.

245.   As a result of Defendants' unlawful actions, Skullcandy has suffered, and continues to suffer immediate and irreparable harm.   Skullcandy has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

246.   Pursuant to Utah Code Ann. § 13-11a-4(2), Skullcandy is entitled to injunctive relief enjoining Defendants' infringing conduct, as well as damages, and attorneys' fees and costs.

247.   Skullcandy is also entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## <u>SIXTH CAUSE OF ACTION</u>
### Unfair Competition
### Utah Code Ann. § 13-5a-102

248.   Skullcandy hereby incorporates the allegations set forth in the foregoing paragraphs as if fully set forth herein.

249.   This claim arises under the laws of the State of Utah.

250.   Skullcandy is the owner of the Skullcandy Trademarks.

251.   Skullcandy has registered the Skullcandy Trademarks with the United States Patent and Trademark Office.

252.   The Skullcandy Trademarks are valid and subsisting trademarks in full force and effect.

253.   Defendants willfully and knowingly used, and continue to use, the Skullcandy Trademarks in interstate commerce, including through their product listings on Amazon, for the purpose of advertising promoting, and selling products bearing the Skullcandy Trademarks without the consent of Skullcandy.

254.   Defendants' advertisements and promotions of products unlawfully using the Skullcandy Trademarks have been disseminated to the relevant purchasing public.

255.   The products Defendants advertise and sell bearing the Skullcandy Trademarks are not authorized for sale by Skullcandy.

256.   Skullcandy has established legitimate, substantial, and non-pretextual quality control procedures over Skullcandy products.

257.   Skullcandy abides by these quality control procedures and requires all of its Authorized Dealers to abide by these quality controls.

258.   The products Defendants advertise, promote, and sell are not genuine Skullcandy products because the products are not authorized for sale by Skullcandy and are materially different from genuine Skullcandy products.

259.   Skullcandy's quality controls are material, as they protect consumers and prevent them from receiving poor quality products that could harm them. When a consumer is deciding whether to purchase a product bearing the Skullcandy Trademarks, whether the product is subject to and abides by Skullcandy's quality controls would be relevant to the consumers' purchasing decision.

260.   The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements.

261.   The products Defendants advertise, promote, and sell bearing the Skullcandy Trademarks do not come with the Limited Warranty.

262.   Because the products Defendants advertise and sell bearing the Skullcandy are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come with the Limited Warranty, the products Defendants sell are materially different from genuine Skullcandy products.

263.   Because the products Defendants advertise and sell bearing the Skullcandy Trademarks are not subject to, do not abide by, and interfere with Skullcandy's quality controls and customer service requirements, and do not come

with the Limited Warranty, the products Defendants sell are not genuine Skullcandy products.

264.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks interferes with Skullcandy's quality controls and ability to exercise quality control over products bearing the Skullcandy Trademarks.

265.   Defendants' use of the Skullcandy Trademarks in connection with the unauthorized sale and advertising of products is likely to cause confusion, cause mistake, or deceive an appreciable number of ordinarily prudent purchasers as to the affiliation, connection, association, sponsorship or approval of Skullcandy products because it suggests that the products Defendants offer for sale originate from, or are sponsored, authorized, approved, or otherwise connected with Skullcandy when, in fact, they are not.

266.   Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising infringes on the Skullcandy Trademarks.

267.   Defendants' unauthorized sale of products bearing Skullcandy Trademarks and unauthorized use of Skullcandy Trademarks in advertising has materially damaged the value of the Skullcandy Trademarks and has caused significant damages to Skullcandy's business relations.

268.   Defendants' unauthorized sale of products bearing the Skullcandy Trademarks, and unauthorized use of the Skullcandy Trademarks in advertising constitute unfair competition under Utah Code Ann. § 13-5a-102.

269.   As a result of Defendants' unlawful actions, Skullcandy has suffered, and continues to suffer, irreparable harm.   Skullcandy has also suffered, and continues to suffer, damages, including, but not limited to, loss of business, goodwill, reputation, and profits in an amount to be proven at trial.

270.   Pursuant to Utah Code Ann. § 13-5a-103(1), Skullcandy is entitled to actual damages, punitive damages, and attorneys' fees and costs.

271.   Skullcandy is also entitled to punitive damages because Defendants acted willfully and maliciously toward Skullcandy or with knowing or reckless indifference toward, and disregard of, the rights of Skullcandy.

## **PRAYER FOR RELIEF**

WHEREFORE, Skullcandy prays for relief and judgment as follows:

A.    Judgment in favor of Skullcandy and against Defendants in an amount to be determined at trial including, but not limited to, compensatory damages, statutory damages, treble damages, restitution, including disgorgement of profits, punitive damages, and pre-judgment and post-judgment interest, as permitted by law;

B.     That a preliminary and permanent injunction be issued enjoining Defendants and any employees, agents, servants, officers, representatives, directors, attorneys, successors, affiliates, assigns, any and all other entities owned or controlled by Defendants, and all of those in active concert and participation with Defendants (the "Enjoined Parties") as follows:

i)     Prohibiting the Enjoined Parties from advertising or selling, via the Internet or otherwise, all Skullcandy products;

ii)    Prohibiting the Enjoined Parties from using any of the Skullcandy Trademarks in any manner, including advertising on the Internet;

iii)   Prohibiting the Enjoined Parties from importing, exporting, manufacturing, producing, distributing, circulating, selling, offering to sell, advertising, promoting, or displaying any and all Skullcandy products as well as any products bearing any of the Skullcandy Trademarks;

iv)    Prohibiting the Enjoined Parties from disposing of, destroying, altering, moving, removing, concealing, or tampering with any records related to any products sold by them which contain the Skullcandy Trademarks, including: invoices, correspondence with vendors and distributors, bank records, account books, financial statements, purchase contracts, sales receipts, and any other records that would reflect the source of the products that Defendants have sold bearing these trademarks;

v)     Requiring the Enjoined Parties to take all action to remove from the Enjoined Parties' websites any reference to any of Skullcandy's products, or any of the Skullcandy Trademarks;

vi)    Requiring the Enjoined Parties to take all action, including but not limited to, requesting removal from the Internet search engines (such as Google, Yahoo!, and Bing), to remove from the Internet any of the Skullcandy Trademarks which associate

Skullcandy's products or the Skullcandy Trademarks with the Enjoined Parties or the Enjoined Parties' website;

vii)   Requiring the Enjoined Parties to take all action to remove unauthorized Skullcandy Trademarks from the Internet, including from www.amazon.com;

C.    An award of attorneys' fees, costs, and expenses; and

D.    Such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Skullcandy demands a trial by jury on all claims and issues so triable.

Respectfully submitted,

Dated: December 4, 2018

STOEL RIVES, LLP

By    */s/ Monica S. Call*
Monica S. Call

Attorneys for Skullcandy, Inc.